THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

| | | |
|---|---|---|
| EUGENE S., | ) | Case No. 1:09CV00101 DS |
| Plaintiff, | ) | |
| vs. | ) | MEMORANDUM DECISION AND ORDER |
| | ) | |
| HORIZON BLUE CROSS BLUE SHIELD OF NEW JERSEY, | ) | |
| Defendant. | ) | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## I. INTRODUCTION

Plaintiff Eugene S. ("Plaintiff") seeks additional payment of medical benefits from Defendant Horizon Blue Cross Blue Shield of New Jersey ("Horizon") for residential mental health treatment of his son, A.S., under the Employee Retirement Income Security Act, 29 U.S.C. §§ 1001, *et seq*. ("ERISA"). Horizon is the administrator and insurer of the group health benefits plan (the "Plan") covering Plaintiff and his family. Pursuant to a Vendor Services Agreement, Horizon delegated authority to administer its Managed Mental Health Benefits Program to Magellan Behavior Health of New Jersey, LLC ("Magellan"). Plaintiff and Horizon have filed cross Motions for Summary Judgment.

Plaintiff's fifteen-year-old son, A.S., had a history of depression and anger management. A.S. was hospitalized twice in 2006, once in March for about a week and a half, and once in May

for about two weeks. After the second hospitalization A.S. attended a wilderness program for troubled teens. Thereafter, A.S. was admitted to Island View Residential Treatment Center (" Island View"), a licensed health care facility located in Syracuse, Utah, which provides residential treatment and therapy to adolescents with mental, behavioral and emotional problems. A.S. was treated at Island View from August of 2006 until June, 2007. Magellan ultimately approved coverage for his treatment at Island View from his admission date through November 2, 2006, but denied coverage for A.S.'s remaining stay. By this action Plaintiff seeks payment of benefits for the remainder of A.S.'s residential treatment at Island View.

## II. STANDARD OF REVIEW

Because the parties in this ERISA case both seek summary judgment and have stipulated to the Court that no trial is necessary, "'summary judgment is merely a vehicle for deciding the case; the factual determination of eligibility for benefits is decided solely on the administrative record, and the non-moving party is not entitled to the usual inferences in its favor.'" *LaAsmar v. Phelps Dodge Corp. Life, Accidental Death & Dismemberment and Dependent Life Ins.* 605 F.3d 789, 796 (10th 2010)(quoting *Bard v. Boston Shipping Ass'n*, 471 F.3d 229, 235

(1st Cir. 2006)(internal quotation omitted)).[1]

**A. *De Novo* or Arbitrary and Capricious Review.**

"[A] denial of benefits challenged under [ERISA] is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. V. Bruch*, 489 U.S. 101, 115 (1989). If the plan gives the administrator discretionary authority, courts "employ a deferential standard of review, asking only whether the denial of benefits was arbitrary and capricious." *Weber v. GE Group Life Assurance Co.*, 541 F.3d 1002, 1010 (10th Cir. 2008)(citations and quotations marks omitted). Horizon contends that an arbitrary and capricious standard of review applies, while Plaintiff urges that *de novo* review is applicable.

Here, the Summary Plan Description provides that payment will be made only when certain criteria are satisfied including that "[s]ervices, **in our [Horizon's] judgment,** are provided at the proper level of care (Inpatient; Outpatient; Out-of-Hospital; etc.)" and that "[s]ervices or supplies **are Medically Necessary**

---

[1] *See also Panther v. Synthes* (USA), 380 F. Supp. 2d 1198, 1207 n.9 (D. Kan. 2005)(citing *Olenhouse v. Commodity Credit Corp*. 42 F.3d 1560, 1579 & n. 31 (10th Cir. 1994)(rather than examining the motions under the traditional summary judgment standard, "the court acts as an appellate court and evaluates the reasonableness of a plan administrator or fiduciary's decision based on the evidence contained in the administrative record").

**and Appropriate ...".** Wood Decl., Ex A. at 48 (emphasis added).[2]

As set forth in the Summary Plan Description, Horizon also is granted discretion to interpret and apply the term "Medically Necessary and Appropriate". That term is defined in part as follows: "A service or supply is Medically Necessary and Appropriate if, as recommended by the treating Practitioner and **as determined by Horizon BCBSNJ's medical director or designee(s)**, it is ..." , among other things, "[t]he most appropriate supply or level of service ..." and "[c]ost effective for the applicable condition, compared to alternative interventions..." Id. 20-21 (emphasis added). With respect to mental health care benefits, Horizon entered into a Vendor Services Agreement with Magellan by which it delegated to Magellan the authority to administer and manage its Managed Mental Health Program, including responsibility for providing medical necessity reviews and appeals. *See* Wood Decl., Ex B.

The Tenth Circuit does not require "any magic words, such as 'discretion,' 'deference,' 'construe' or 'interpret'" in order to find discretionary authority. *Gust v. Coleman Co.*, 740 F. Supp. 1544, 1550 (D. Kan. 1990), *aff'd*, 936 F.2d 583 (10th Cir.

---

[2] The Court agrees with Horizon that despite Plaintiff's assertion to the contrary, there is no requirement in this Circuit that grants of discretionary authority must appear in both the Summary Plan Description and the master plan document in order to convey discretionary authority to the plan administrator. "The discretionary language need only be in the Plan or the SPD." *Lemon v. EA Miller, Inc.*, No. 1:04CV107 DAK, 2005 WL 925656, *4 n.1(D. Utah April 18, 2005).

1991)(table).  And the  Circuit has been "comparatively liberal in construing language to trigger the more deferential standard of review under ERISA."  *Nance v. Sun Life Assur. Co. of Canada*, 294 F.3d 1263, 1268 (10th Cir. 2002.).

Because the Summary Plan Description gives the Administrator discretion to determine medically necessary and covered services, the Court concludes that the relevant language is sufficient to grant Horizon, and through it via the Vendor Services Agreement, Magellan, discretion to interpret the Plan and to trigger an arbitrary and capricious standard of review.[3]

---

[3]See e.g. McGraw v. Prudential Ins. Co., 137 F.3d 1253, 1259 (10th Cir. 1998)(finding that the plan administrator had discretion regarding medical necessity reviews, when the Plan stated, "'[t]o be considered "needed," a service or supply must be determined by [the plan administrator] to meet all of these tests'"); *Charter Canyon Treatment Center v. Pool Col*, 153 F.3d 1132, 1135 (10th Cir. 1998)(language stating that the insurer had "'the exclusive right to interpret the Medical Plan and to decide all matters arising thereunder'" was  sufficient to trigger discretionary review); *Winchester v. Prudential Life Ins. Co. Of Am.*, 975 F.2d 1479, 1483 (10th Cir. 1992)(held that language "'Prudential, as Claim Administrator, determines the benefits for which an individual qualifies under the Benefit Plan'" was sufficient to trigger an arbitrary and capricious level or review).

Under the arbitrary and capricious standard, the Court's "review is limited to determining whether the interpretation of the plan was reasonable and made in good faith." *Kellogg v. Metropolitan Life Ins. Co.*, 549 F.3d 818, 825-26 (10th Cir.2008)(internal alterations, quotations omitted).[4] An administrator's decision will be upheld "'so long as it is predicated on a reasoned basis.'" *Graham v. Hartford Life & Accident Ins. Co.*, 589 F.3d 1345,,1357 (10th Cir. 2009),cert. denied, 130 S. Ct. 3356 (2010)(quoting *Adamson v. Unum life Ins. Co. Of Am.*, 455 F.3d 1209, 1212 (10th Cir. 2006). An interpretation or decision under the arbitrary and capricious standard "'need not be the only logical one nor even the best one.'" Hancock v. Metropolitan Life Ins. Co., 590 F.3d 1141,

---

[4]In this regard, the Court is instructed as follows:
In determining whether [the administrator's] decision is arbitrary and capricious, we consider only the arguments and evidence before the administrator at the time it made that decision and decide: (1) whether substantial evidence supported [the administrator's] decision; (2) whether [the administrator] based its decision on a mistake of law; and (3) whether [the administrator] conducted its review in bad faith or under a conflict of interest. The Administrator's decision need not be the only logical one nor even the best one. It need only be sufficiently supported by facts within his knowledge to counter a claim that it was arbitrary or capricious. The decision will be upheld unless it is not grounded on any reasonable basis.

*Finley v. Hewlett-Packard Co. Employee Benefits Org. Income Prot. Plan*, 379 F.3d 1168, 1176 (10th Cir. 2004) (internal quotation marks & citations omitted ).

1155 (10th Cir. 2009)(quotation omitted). "Certain indicia of an arbitrary and capricious denial of benefits include 'lack of substantial evidence, mistake of law, bad faith, and conflict of interest by the fiduciary'". *Graham*, 589 F.3d at 1357 (quoting *Caldwell v., Life Ins. Co. of N. Am.*, 287 F.3d 1276, 1282 (10th Cir. 2002)).[5]

### III.  DISCUSSION

**A.  Review of Plan Decision.**

After several appeals, Horizon ultimately concluded that A.S.'s conditions met the criteria for residential admission and treatment through November 2, 2006. However, Horizon denied coverage for A.S.'s continued stay from November 3, 2006, through the date of his discharge on June 12, 2007.[6] It is payment of benefits for this period that is at issue.

---

[5]The Court rejects Plaintiff's position that Horizon's role as both insurer and administrator of the Plan created an inherent conflict of interest between staying financially sound and its discretion in paying claims, and therefore, Horizon is not entitled to an undiluted abuse of discretion standard of review. Through the Vendor Services Agreement, Horizon delegated to Magellan the authority to administer its Managed Mental Health Program. Because it was Magellan, and not Horizon, that made the determination regarding Plaintiff's benefits there is no conflict of interest.

[6]On February 11, 2008, Magellan held an appeal panel which considered Plaintiff's second appeal and which resulted in a partial approval and partial denial of Plaintiff's claim. The panel partially reversed Magellan's initial determination and approved coverage for A.S.'s residential treatment from his admission on August 10, 2006 through November 2, 2006, but upheld Magellan's initial determination that the medically necessary criteria were not met for treatment from November 3, 2006 through his discharge on June 12, 2007.

Magellan based its denial of benefits determination on its conclusion that as of November 3, 2007, A.S. no longer met the medical necessity criteria for continued stay at a residential psychiatric treatment facility since he could have been safely and effectively treated at a less restrictive level of care. A copy of the Criteria for Admission and for Continued Stay for Adolescent Psychiatric Residential Treatment developed by Magellan is attached hereto as Exhibit A.

By letter dated February 11, 2008, Magellan explained its reasoning for denying coverage for residential treatment as of November 3, 2006.

> Based on the clinical information provided, as of 11/3/06, the **patient no longer met medical necessity criteria for continued stay at a residential psychiatric treatment facility since he could have been safely and effectively treated at a less restrictive level of care**. He was consistently demonstrating compliance and cooperation with the treatment. He did not have any suicidal or violent ideations. There was no reported information to indicate that he exhibited an inability to adequately care for his own physical needs due to a psychiatric disorder anymore. There was no reported information that the patient required supervision 24 hours a day, seven days a week to develop skills necessary for daily living. He went home on a pass and did well with his parents. By 11/3/06, the patient met criteria for continued treatment at the intensive outpatient level of care to provide several hour/day, multiple times/week psychiatric evaluation and treatment including counseling, education and therapeutic interventions. Therefore, Magellan Behavioral Health is unable to authorize continued psychiatric related residential care from 11/3/06-6/12/07.

Wood Decl., Ex. C at HORIZ00004 (emphasis added).

Evidence of record reasonably can be viewed as supporting

Magellan's determination that residential treatment for A.S. was not medically necessary as of November 3, 2006, because he could have been treated at a less restrictive level of care. For example, as Horizon notes, A.S.'s primary therapist recorded in his Discharge Summary that A.S.'s depression "resolved" during the first few months of his treatment.[7] A.S.'s primary therapist also noted that, although A.S. continued to struggle with anxiety and "melt downs', these "episodes would only last approximately a day or two at the longest and decreasing in frequency and length of time over the period of his stay." Wood Decl., Ex. C at HORIZ000085. The record reflects that during the last several months of A.S.'s stay at Island View "he had very minimal struggles with these episodes and was able to utilize effective coping skills in managing these moods, feelings and thoughts much more effectively." *Id*. The November 2006 Monthly Resident Review indicates that during that review period, A.S. became better able to handle feedback and was progressing well in anger management, stress reduction, and anxiety management skills. *Id*. at HORIZ000211. A.S. began having successful therapeutic leaves of

---

[7]The Discharge Summary in part states:
Early on in the course of treatment [A.S.] did continue to exhibit some significant depressive symptomology including suicidal ideation and self-harming behavior. However, these symptoms diminished rapidly during the first couple of months in treatment and [A.S.] was able to experience stabilization of his mood. He did not show any chronic symptoms of depression as these depressive symptoms resolved within the first couple of months of treatment at Island View.
Wood Decl., Ex. C at HORIZ00085

absence on November 3, 2006. *Id*. at HORIZ000210; HORIZ000316. And the record reflects that A.S. went on therapeutic leave for some time each month during the remainder of his stay at Island View , which could be viewed as demonstrating that he was able to adequately care for his own needs and that his family support system was also able to fulfill those needs.  *See* Def.['s] Mem. Opp'n at xlii - xliii and citations set forth therein. .

    While Horizon concedes that it may be that A.S. was not diagnosed as obsessive-compulsive until February 2007, the Court agrees with Horizon that "[s]imply identifying a new medical problem is insufficient under these Criteria [for continued stay], and here, there is no evidence that this new diagnosis would have independently satisfied the admission criteria (both in severity of need and intensity of service needs) for impatient treatment, as required under the Continued Stay Criteria." Pl.['s] Mem. Opp'n at 14.  The February 2007 Monthly Resident Review does not specify that A.S.'s anxiety was debilitating. *See* Wood Decl., Ex. C at HORIZ000192.  A.S.'s obsessive-compulsive behavior manifested itself with obsessive thoughts about confessing insignificant behaviors, as well as some compulsive behaviors, such as compulsive hand washing
. *Id.*  As Horizon notes, there is record evidence that suggests that  A.S.'s family could handle his needs because even when some of his obsessive confessional behaviors manifested at home during a therapeutic leave of absence in February 2007, the leave was

still "generally a very positive experience". *Id.*

To be fair, there also is record evidence that can be interpreted as supporting Plaintiff's assertions that A.S. "continued throughout his treatment to struggle and experience setbacks", Pl.['s] Mem. Supp. at 21, and "intermittently" throughout his treatment period he met the criteria for "risk of harm to self", *id.*, and that he "was exhibiting some difficulty in providing for his own needs in the sense that he continued to experience intermittent self-harm ideation and was engaged in compulsive behaviors that were physically harmful" *id*. However, the Court cannot conclude based on the record, the applicable standard of review, and the arguments of Plaintiff, that Defendant's denial of benefits was arbitrary and capricious. Plaintiff by its Motion has failed to counter Horizon's explanation, supported by facts of record, that its decision to discontinue benefits for A.S.'s residential treatment was grounded on a reasonable basis.

In sum, evidence of record reasonably can be viewed as supporting the administrator's decision to deny continued benefits for the residential treatment of A.S. The Court, therefore, concludes that the decision to deny payment for A.S.'s residential treatment at Island View from November 3, 2006, through the date of his discharge on June 12, 2007, was not arbitrary or capricious.

## IV. CONCLUSION

For the reasons stated, as well as generally for those additional reasons set forth by Defendant in its pleadings, Plaintiff Eugene S's Motion for Summary Judgment (Doc. #15) is DENIED, and Defendant Horizon's Motion for Summary Judgment (Doc. #19) is GRANTED.  The Clerk of Court is requested to enter final judgment for Defendant Horizon.

IT IS SO ORDERED.

DATED this 22nd day of December, 2010.

BY THE COURT:

DAVID SAM
SENIOR JUDGE
UNITED STATES DISTRICT COURT

# Residential Treatment, Psychiatric, Child and Adolescent

## Criteria for Admission

The specified requirements for severity of need and intensity and quality of service must be met to satisfy the criteria for admission.

I. Admission - Severity of Need

   Criteria A, B, C, D and E must be met to satisfy the criteria for severity of need.

   A. There is clinical evidence that the patient has a DSM-IV disorder that is amenable to active psychiatric treatment and has a high degree of potential for leading to acute psychiatric hospitalization in the absence of residential services.

   B. Due to the psychiatric disorder, the patient exhibits an inability to adequately care for his/her own physical needs, representing potential serious harm to self and/or others. The family and/or other non-residential community support systems are unable to safely fulfill these needs.

   C. The patient requires supervision 7 days per week/24 hours per day to develop skills necessary for daily living, to assist with planning and arranging access to a range of educational, therapeutic and aftercare services, and to develop the adaptive and functional behavior that will allow him/her to live outside of a residential setting.

   D. The patient's current living environment does not provide the support and access to therapeutic services needed.

   E. The patient is medically stable and does not require the 24 hour medical/nursing monitoring or procedures provided in a hospital level of care.

II. Admission - Intensity and Quality of Service

   Criteria A, B, C and D must be met to satisfy the criteria for intensity and quality of service.

   A. The evaluation and assignment of a DSM-IV diagnosis must result from a face-to-face psychiatric evaluation.

   B. The program provides supervision 7 days per week/24 hours per day to assist with the development of skills necessary for daily living, to assist with planning and arranging access to a range of educational, therapeutic and aftercare services, and to assist with the development of the adaptive and functional behavior that will allow the patient to live outside of a residential setting.

   C. An individualized plan of active psychiatric treatment and residential living support is provided in a timely manner. This treatment must be medically monitored, with 24-hour medical availability and 24-hour onsite nursing services. This plan includes:
      - intensive family and/or supportive person involvement occurring at least once per week, or identifies valid reasons why such a plan is not clinically appropriate, *and*

22

HORIZ000024

5

- psychotropic medications to be used with specific target symptoms identified, *and*
- evaluation for current medical problems, *and*
- evaluation for concomitant substance use issues, *and*
- linkage and/or coordination with the patient's community resources with the goal of returning the patient to his/her regular social environment as soon as possible, unless contraindicated. School contact should address Individualized Educational Plan/s as appropriate.

D. A discharge plan is initially formulated that is directly linked to the behaviors and/or symptoms that resulted in admission and begins to identify appropriate post-residential treatment resources.

## Criteria for Continued Stay

III. Continued Stay

Criteria A, B, C, D and E must be met to satisfy the criteria for continued stay.

A. Despite reasonable therapeutic efforts, clinical evidence indicates at least one of the following:
- the persistence of problems that caused the admission to a degree that continues to meet the admission criteria (both severity of need and intensity of service needs), *or*
- the emergence of additional problems that meet the admission criteria (both severity of need and intensity of service needs), *or*
- that disposition planning and/or attempts at therapeutic re-entry into the community have resulted in, or would result in exacerbation of the psychiatric illness to the degree that would necessitate continued residential treatment.

B. There is evidence of objective, measurable, and time-limited therapeutic clinical goals that must be met before the patient can return to a new or previous living situation. There is evidence that attempts are being made to secure timely access to treatment resources and housing in anticipation of discharge, with alternative housing contingency plans also being addressed.

C. There is evidence that the treatment plan is focused on the alleviation of psychiatric symptoms and precipitating psychosocial stressors that are interfering with the patient's ability to return to a less intensive level of care.

D. The current or revised treatment plan can be reasonably expected to bring about significant improvement in the problems meeting criterion IIIA, and this is documented in weekly progress notes, written and signed by the provider.

E. There is evidence of intensive family involvement occurring at least once per week (unless there is an identified valid reason why such a plan is not clinically appropriate or feasible).

HORIZ000025